Pichowicz v. Hoyt, et al.          CV-92-388-M    03/31/99
                    UNITED STATES DISTRICT COURT

                    DISTRICT OF NEW HAMPSHIRE


Nicholas and Joan Pichowicz, Plaintiffs,
and NH VT Health Service
      Intervenor-Plaintiff,

      v.                                    Civil No. 92-388-M

Pearl Hoyt, et al.,[1]
      Defendant.

                          **O R D E R**

      Following entry of default judgment,[2] a damages hearing was

_____

      [1]  Plaintiffs negotiated a settlement of all claims against
the other defendants.

      [2]  Defendant Pearl Hoyt was properly served on September 4,
1992, and thereafter wrote to plaintiffs' counsel advising that
she had no assets (and, at least implicitly, that she did not
care to defend).  Plaintiffs' counsel thereupon took the
initiative to notify potentially liable insurance companies of
the facts of suit, service on the insured (Mrs. Hoyt), and
potential coverage, in an effort to induce an appearance on
Defendant Hoyt's behalf.  Default was entered in December of
1993.  Plaintiffs' counsel continued to notify potential carriers
of the progress of the matter, but obtained no appearance, even
with a reservation of rights.  It was not until after a partial
settlement was negotiated with other defendants that Hoyt
(through an insurance carrier) sought to appear and strike the
default entered over four years earlier.  The motion to strike
was denied, essentially for the reasons set forth in plaintiffs'
objection and supporting memorandum (document no. 161).
Defendant proffered no reasonable explanation for her default
(document no. 160) (and no reasonable explanation was given for
her carrier's failure to enter an earlier appearance); the timing
of the motion was obviously extraordinarily late; the plaintiffs
settled with the other defendants relying on finality with
respect to liability issues given the four year old Hoyt default;
and, while defendant arguably sketched a plausible theory of
defense, it is not a strong one and, that factor (plausible
defense) does not outweigh the other factors militating against
setting aside the default.  See e.g. Coon v. Grenier, 867 F.2d 73
(1st Cir. 1989).

held pursuant to Federal Rule of Civil Procedure 55(b)(2).
Plaintiffs claim damages of two different types — personal injury and contamination of their real property — resulting from hazardous waste migration from the shopping plaza previously owned by defendant to their residence.  Plaintiffs say they suffer from a number of medical conditions caused by prolonged exposure to Tetrachloroethene (PCE), Trichloroethene (TCE), and 1, 2, Dichloroethene (DCE), albeit at relatively low levels, from the well water they drank and were otherwise exposed to over a number of years.  They also claim that the volatile organic compounds in the groundwater beneath their property, and in the wells previously used for household consumption, stigmatized and lowered the value of their real property.

## Discussion

Having considered the testimony, evidence, and exhibits proffered at the damages hearing the court finds that plaintiffs have met their burden of establishing, by a preponderance of the evidence, damage to their property caused by the discharge of volatile organic compounds which migrated from defendant's property to the groundwater beneath plaintiffs' residential property and into wells previously used by them for drinking and other household purposes.  However, plaintiffs have not met their burden of proof with regard to causation as it relates to their medical conditions, and so have not proven that the personal

2

injuries they describe are the result of exposure to those contaminants.

<u>Medical Injuries</u>

Nicholas Pichowicz and Joan Pichowicz believe, and therefore assert, that their current physical and psychological ailments are the product of chronic exposure to low levels of PCE, TCE, and DCE in their residential wells over an extended period of time preceding 1984 (when the wells were no longer used for household purposes). In 1989, the New Hampshire Department of Environmental Services tested plaintiffs' wells and detected the presence of VOCs in excess of safe drinking water standards, which has been determined to be 5 parts per billion ("ppb"). The contaminants found, PCE, TCE, and DCE, are generally associated with dry cleaning and degreasing operations. Indeed, a dry cleaning establishment operated on defendant's property for a number of years, up gradient from plaintiffs' residence. The groundwater flow and other hydrogeologic data support the conclusion, for purposes of determining causation, that VOCs were discharged into the environment on defendant's property and, over a number of years, migrated from the septic system to the leachfield and into the groundwater, eventually reaching and contaminating plaintiffs' wells. The court so finds. The court rejects defendant's thesis that another source could have generated the major share of contaminants, and finds that defendant's property was the major source of contamination and

3

she is more than fifty percent liable for the ensuing damages (N.H. Rev. Stat. Ann. 507:7.e).

The evidence establishes that the level of contamination was comparatively low. However, little credible evidence was presented regarding the actual levels of contamination before 1989. But even extrapolating from that evidence in a manner favorable to plaintiffs, it is clear that the water to which they were exposed contained, at most, between 20 and a few hundred parts per billion of VOCs. While that amount exceeds established safe drinking water standards, the adverse health risks scientifically associated with exceeding that standard relate to liver damage and cancer, conditions plaintiffs do not have. No reliable evidence was presented from which the court can conclude that those relatively minor exposure levels probably caused the myriad illnesses complained of by plaintiffs.

In Mr. Pichowicz's case, he attributes chronic headaches, memory loss, depression, numbness, tremors, lack of balance, and depression to his pre-1984 consumption and use of contaminated well water. Mrs. Pichowicz claims somewhat milder effects. The first difficulty however, is that Mr. Pichowicz was examined in 1985 by a neurologist, Dr. Richard Levy. Dr. Levy concluded that with a few exceptions related to classical cluster headaches, carpal tunnel syndrome, and peripheral neuropathy, the examination was normal. His review of more current records led to essentially the same conclusion.

4

A second difficulty is more significant, however. Plaintiffs have not shown medical causation. Dr. Robert Feldman's opinion, that exposure to these contaminants over several years at levels of 100 ppb "to a reasonable degree of medical certainty" caused the neurologic impairments plaintiffs complain of, is rejected as insufficiently supported and unpersuasive. While anecdotal observation may well suggest a hypothesis — that a causal link might exist between exposure to VOCs in drinking water and neurological impairment — that link was not proven by a preponderance of the evidence, which is plaintiffs' burden.[3]

As Dr. Levy explained, Mr. Pichowicz's neurologic examination in 1985 was essentially normal, and what problems were detected (cluster headaches, carpal tunnel syndrome and peripheral neuropathy) have many potential and plausible causes. Given the very low levels of VOC exposure, there is simply no adequate basis in this record to conclude, scientifically or from an evidentiary point of view, that plaintiffs have met their burden of proving a causal relationship between their current medical complaints and the low level contamination of their well water during the late seventies and early eighties. (The record reveals other far more likely causes of many of these conditions — accidents, physical injuries, family stress, etc.) More than a

_____

[3] Parenthetically, the court notes that it has considered Dr. Feldman's testimony, notwithstanding significant doubt as to its admissibility under Fed. R. Evid. 702.

clinical differential diagnosis based on an unproven hypothesis is required to meet that causation burden.

In any event, the court adopts Dr. Laura Green's credible expert testimony as representing the current state of scientific knowledge. Among other things, Dr. Green testified that: these chemicals, in the small concentrations reflected in the record, are not neurotoxic; they have not been scientifically demonstrated to be neurotoxic; and the levels at which plaintiffs were exposed fall far below even that level of concentration established by the Occupational Safety and Health Administration's standard for workplace exposure (above which there is a risk of a demonstrated narcotic but not a demonstrated neurotoxic effect). In short, the court concludes, based on all the evidence and, in particular, Dr. Green's testimony, that plaintiffs have not proven, by a preponderance, that the medical conditions about which they complain, and may well suffer from, are causally linked to their limited exposure to PCE, TCE, or 1, 2, DCE, before 1984. While Dr. Feldman's clinical observations and hypotheses linking chronic low level exposure to neurological manifestations cannot be dismissed as scientifically implausible, neither the toxicology literature, nor Dr. Feldman's own work, as presented in this record, suggests more than a basis for further scientific inquiry into and investigation of the question. The evidence in this record, however, is entirely insufficient to establish a causal connection, much less establish it by a preponderance, between extended exposure to low levels of VOCs in

6

drinking water and the neurologic symptoms and conditions plaintiffs report. The evidence does not establish by a preponderance that these low levels of PCE, TCE, and 1, 2, DCE, are neurotoxic, or that they caused the ailments at issue.

Accordingly, no damages are awarded for personal injury.

## Property Damage

There is little question that residential property sitting on groundwater contaminated by volatile organic compounds, and that has been the subject of governmental testing, investigation, and some remediation measures, becomes devalued in the marketplace. Having found the requisite causation — the contaminants originated from defendant's property and migrated via the septic system and leachfield to the groundwater and then to plaintiffs' wells — the court concludes that defendant is liable for that diminution in value.

The parties submitted evidence on that element of damage in writing in the form of competing expert appraisals. The appraisals relate only to the plaintiffs' principal residence, as of September 10, 1996. However, plaintiffs also claim property value losses associated with condominiums and a small office building they built on subdivided parcels of their property. Mrs. Pichowicz, as landowner, testified that of twelve condominium apartments they built, eight were sold before the contamination was revealed, for amounts exceeding $80,000 each. After the contamination was discovered (1989), the four remaining

7

condominiums did not move, and eventually sold in 1990 and 1994 for an average approximate price of $45,000. The office building, she testified, was offered for sale at $275,000 prior to knowledge of the groundwater contamination, and eventually sold, after notice, for only $72,932.50.

The professional appraisals differ substantially on two basic points — the value of plaintiffs' residential property absent the contaminated groundwater, and the discount in value appropriate to reflect what both experts acknowledge as market stigma resulting from the contamination (requiring substantial price concessions to sell the asset). Plaintiffs' expert values the property absent contamination at approximately $400,000, while defendant's expert sets that value at $295,000. While both numbers probably err to some degree in favor of the client, plaintiffs' expert's assessment is more persuasive, and the court finds that a fair value for the residential property absent contamination is $400,000.

Plaintiffs' expert suggests a discount in value of 50% due to the groundwater contamination and the concomitant stigma and negative effect on marketability. Defendant's expert says 20% to 25% is a more realistic, and fact based, reflection of the diminution occasioned by this particular groundwater pollution.

While a discount of 20% to 25% is at the low end of ranges represented in some comparable situations, the court agrees that a low end discount range is appropriate in this case because the contamination is not severe, the remediation required (filtering

drinking water and maintaining monitoring wells) is neither extensive nor expensive, and the contamination is not permanent and will eventually be substantially remedied with little or no effort required by plaintiffs or subsequent owners (the concentrations of VOCs are very small and the groundwater flow will increasingly dilute those concentrations — no injection of diluting water, or pumping groundwater through filters, or other extensive recovery measures have been, nor will likely be required to address the situation). Lending institutions of course also play a vital part in facilitating the sale of real property, and many harbor ill-informed biases with respect to lending on any property dubbed as "contaminated." But in this case only a modest investment of reason and knowledge will likely produce financing for qualified purchasers of this property, without much difficulty. The court finds that, under all the circumstances pertaining here, a discount in value fairly reflecting the loss occasioned by the stigma arising from the known contamination is 25%.

Applying that discount to the fair value of plaintiffs' residential property absent contamination yields a loss of $100,000.

As mentioned, expert appraisers for both sides agree that a loss in value certainly accompanies any real property discovered to be contaminated. It is equally clear, then, that plaintiffs suffered measurable economic losses when they sold the four condominiums after discovery of the groundwater contamination,

9

and when they sold the small office building they developed. But, those losses are not so great as plaintiffs suggest. It is by now common knowledge that after 1989 (when the contamination was discovered) the real estate market, in particular, and the New Hampshire economy in general, suffered a very serious downturn. Five major banks failed and property values plummeted. Some substantial portion of the diminished value of plaintiffs' remaining condominiums and office building was no doubt due to those unrelated market conditions. (And, of course, the mere fact that plaintiffs put the office building up for sale at $275,000, does not persuasively establish its value at that level.)

But it is not necessary to dwell on the difficulties of sorting those mixed factors out, because plaintiffs actually sold the remaining condominiums and office building into a free and open market. Therefore, the fair market value of those properties (including a reduction due to stigma) is established: $72,932.50 for the office building and $45,000 (on average) for each of the four remaining condominiums. Considering the lost value discount discussed above (25%), those sale prices reflect only 75% of the fair market value of the properties absent the contamination. So, the total loss on the four condominiums is found to be $60,000 ($60,000 value on each unit, absent contamination, less average actual sale price of $45,000 = average loss of $15,000 on each of four condominiums). The office building was sold for $72,932.50. Applying the same

10

analysis, the loss occasioned by the stigma arising from the discovery of contamination is $24,311 (fair market value absent contamination would have been $97,243, and the difference of $24,311 represents the 25% loss attributable to contamination stigma).

In addition, plaintiffs incurred some modest remediation expenses (filters, plumbing, etc.) for which the court awards $21,000.

Accordingly, the court determines the total damages suffered by plaintiffs to be, and hereby awards, Two Hundred Five Thousand Three Hundred Eleven Dollars ($205,311.00), plus applicable interest, and costs. Judgment shall be entered in favor of plaintiffs and against defendants in that amount.


**SO ORDERED.**


_____
Steven J. McAuliffe
United States District Judge

March 31, 1999

cc:  Linda J. Argenti, Esq.
     Joseph G. Abromovitz, Esq.
     M. Ellen LaBrecque, Esq.
     Peter S. Wright, Jr., Esq.
     Thomas H. Richards, Esq.

11